No. 109,480

STATE OF KANSAS, *Appellee*, v. DOMINIC MOORE, *Appellant*.

(357 P.3d 275)

Opinion filed August 28, 2015.

*Michael J. Bartee*, of Michael J. Bartee, P.A., of Olathe, argued the cause, and was on the brief for appellant.

*Sheryl L. Lidtke*, chief deputy district attorney, argued the cause, and *Derek Schmidt*, attorney general, was on the brief for appellee.

The opinion of the court was delivered by

JOHNSON, J.: Charles Ford and Larry LeDoux were killed in a shoot-out during an attempted drug-house robbery. Brandon Ford, who survived the incident and who previously knew Cedric Warren, named Warren as one of the two shooters and later identified Warren's codefendant, Dominic Moore, as the second killer. Warren and Moore were tried together, and a jury convicted Moore of one count of premeditated first-degree murder based on an aiding and abetting theory, one count of intentional second-degree murder, and one count of attempted premeditated first-degree murder. The district court imposed a life sentence with a mandatory term of 50 years (hard 50 life sentence) for the first-degree premeditated murder conviction.

On direct appeal to this court, Moore argues that (1) the district court violated his right to an impartial jury by denying his motion for a mistrial after a potential juror's comments irreparably tainted the jury pool; (2) the district court violated his due process rights when it denied his motion to suppress an eyewitness identification; (3) the district court erred in denying his motion for a mistrial and his motion for a new trial based upon the eyewitness' changed testimony at trial; (4) the district court erred in admitting a weapon and the results of scientific testing conducted on it without an adequate chain of custody; (5) the district court erred in instructing the jury to consider the degree of certainty demonstrated by the eyewitness when identifying Moore; (6) cumulative error denied him a fair trial; (7) the hard 50 sentencing scheme is unconstitutional; and (8) the district court erred by ordering lifetime postrelease supervision.

Finding no reversible error, we affirm Moore's convictions. However, pursuant to *Alleyne v. United States*, 570 U.S. ___, 133 S. Ct. 2151, 2160-63, 186 L. Ed. 2d 314 (2013), and *State v. Soto*, 299 Kan. 102, 124, 322 P.3d 334 (2014), we must vacate the hard 50 life sentence and remand the case to the district court for resentencing.

FACTUAL AND PROCEDURAL OVERVIEW

On February 13, 2009, Brandon, Charles, and Larry spent most of the day at a house in Kansas City, Kansas, which was used by Charles and Larry to facilitate their drug transactions. Charles was armed with a loaded nine millimeter Glock and Larry kept a loaded AK-47 within his reach, but Brandon was initially unarmed when two men came to the house that evening.

Brandon's account of what happened when the two men arrived at the house changed several times. Brandon initially told the police that he was walking up to the house when people started shooting at him. Later that day, he changed his account and related that he was inside the house walking toward the bathroom when the two men entered the house, one of whom he knew as "Ced." As he entered the bathroom, Brandon said he heard someone say "where's the shit" or "give me the shit," immediately followed by gunshots. Brandon exited the bathroom and saw a short black male holding a gun, whereupon he ducked into a bedroom, locked its door, and retrieved a weapon. Brandon exchanged gunfire through the closed bedroom door with someone outside. After the shots subsided, Brandon looked out the window and saw two men running toward an SUV. Brandon exited through the bedroom window, ran to a nearby house, and asked the resident to call the police.

When police arrived at the residence, they found Charles' body near the front door surrounded by several different types of cartridge casings and Larry's body in the dining room with .40 caliber Smith and Wesson spent cartridges scattered nearby. Police also discovered a locked bedroom door riddled with bullet holes. A police officer broke down the door and observed an open window in the bedroom.

Although no weapons were found in the house, police recovered multiple gun magazines and a significant amount of ammunition. Police also discovered a black bag hidden inside a clothes dryer; the bag contained packets of cocaine.

Brandon was transported to the police station and shown a lineup, from which he identified Warren as the individual he knew

as "Ced." He also provided the police with a description of the second killer. The day after the murders, police apprehended Warren at a house in Kansas City, Missouri. Moore was also in the house, and he matched the description Brandon gave of the second killer. A search of the Missouri house revealed several weapons, including a Glock nine millimeter semi-automatic handgun, and drugs, all hidden within an air duct. Brandon was later able to select Moore out of a lineup as the short black man he saw in the hallway.

Moore was charged with the premeditated first-degree murder of Larry, based on an aiding and abetting theory; the intentional second-degree murder of Charles; and the attempted premeditated first-degree murder of Brandon. At trial, Brandon testified that he was sitting in the living room when he saw Warren come up the stairs after entering the house. Brandon said that Warren went straight into the kitchen and began shooting at Larry. Brandon ran to the bedroom to retrieve a weapon, but he said that he was able to see Moore, while he was aiming his weapon through the cracked bedroom door, also come up the stairs after entering the house. Brandon admitted that his trial testimony was inconsistent with previous statements, wherein he said he was in the bathroom when shots were fired. Brandon was extensively cross-examined on his inconsistent testimony.

A KBI firearm's examiner testified that the casings found at the crime scene came from three different guns, one of which was the Glock seized from the Missouri residence. Specifically, two cartridge casings found under Charles' body were fired from the Glock. A KBI forensic scientist testified that a sample taken from the Glock was consistent with Moore's DNA profile. The estimated frequency of the sample obtained from the Glock was 1 in 43 for the black population, which the forensic scientist noted is a "pretty common profile." The KBI firearm's expert testified that the bullet recovered from Larry's body was a .40 caliber full metal jacket round, but he was unable to tie it to a particular spent cartridge or to identify the type of weapon from which it was fired.

Warren presented two alibi witnesses in his defense. His stepmother, Nicole Carter, testified that on the night of the murders, Warren was at her house until approximately 11 p.m., when he left

to go to a music show with his father. Warren's father, Cedric Toney, testified that he dropped Warren off at a friend's Kansas City, Missouri, house around midnight. The murders were alleged to have taken place around 11 p.m. Moore did not present any evidence in his defense.

The jury convicted both defendants as charged. Moore filed a motion for new trial, which the district court denied. The State filed a motion for imposition of a hard 50 sentence for Moore's first-degree premeditated murder conviction under K.S.A. 21-4635, which the district court granted. Moore's sentences for the other two convictions were ordered to be served concurrently with the hard 50 life sentence.

Moore filed a notice of appeal 1 day beyond the 14-day jurisdictional limitation of K.S.A. 2011 Supp. 22-3608(c). We ordered Moore to show cause why his appeal should not be dismissed for lack of jurisdiction. Moore responded that *State v. Ortiz*, 230 Kan. 733, 735-36, 640 P.2d 1255 (1982), applied because he was furnished an attorney who failed to perfect and complete the appeal. We retained Moore's appeal. Additional facts are provided as needed to address Moore's claims on appeal.

### Motion for Mistrial Based on Potential Juror's Statements

Moore's first issue concerns comments made by a member of the venire during voir dire. We addressed this precise issue in affirming the conviction of Moore's codefendant, Warren. See *State v. Warren*, 302 Kan. 601, 605-11, 356 P.3d 396 (2015). Nevertheless, we include the entire analysis here, as well.

The potential juror, C.W., expressed fear over rendering a guilty verdict because the defendants had access to the juror questionnaires, which contained his personal information, specifically stating,

"[E]very time we talk they flip through these papers. It's got my name on it, it's got where I work on it, it's got my family, it's got everything, and if I stand up in court and say hey, they're guilty, they're like, hey, that's number 4, that's [C.W.]. They know where I work, they know where I live, what if he gets mad? That's how I look at it."

The prosecutor followed up by inquiring whether C.W.'s apprehension would interfere with his jury duty, and C.W. responded, "Kind of, yeah, because if I stand up and say hey, you're guilty, they know my name, where I work and my family. That makes you feel kind of awkward, don't you think?" C.W. explained that even if the jury rendered a guilty verdict and the defendants went to jail, nevertheless "[t]hey know people. People know people."

Thereafter, the district court conducted a bench conference at which defense counsel requested a mistrial, arguing that the jury pool had been "poisoned at this point beyond—possibly beyond salvation." The prosecutor argued that any possible prejudice could be cured by informing potential jurors that while the defendants could review the questionnaires during jury selection, they did not have access to the questionnaires during the trial. The district court took the motion for mistrial under advisement and thereafter provided the following instruction to the jury pool:

"All right. I guess based upon [C.W.'s] comments, there's I wanted to clarify things. Obviously, this is a serious case and there are serious charges, here. As the defendants sit here, they are presumed to be innocent. The State has the burden to prove their guilt beyond every reasonable doubt as to the elements with which they are charged. It is also their right to have a jury trial, and that is why all of you have been summoned in here to come down here and go through this process. That's why I've asked you questions, Miss Lidtke has asked you questions and counsel will ask you questions.

"The questionnaires that he referred to are simply in order to try to speed up the process as opposed to questioning each of you individually. These questionnaires are used in every trial that we conduct here in Wyandotte County, they have been used for many years, and it's the best possible way that we have come up with to expedite the process as much as we possibly can.

"I understand that there's concerns about your names being on there and information, but those questionnaires are not kept by anyone but the Court. They are collected and destroyed. There is nothing that anyone—the attorneys, the defendants, anyone else will have any information regarding anything what is on those questionnaires. But that is the process that we have, that is the process that we use in every jury trial, whether it's a civil trial or a criminal trial, so with that, Miss Lidtke, let's move on."

Despite the district court's instruction, C.W. still expressed doubt over whether he could return an appropriate verdict. Consequently, the prosecutor moved, without objection from defense

counsel, to strike C.W. for cause. The district court took the motion to strike under advisement.

Voir dire thereafter continued without any other potential juror expressing any safety concerns. Of note, at the close of her voir dire examination, the prosecutor specifically asked the jury pool if there was anything else that needed to be addressed or considered when determining whether a potential juror should serve on the jury. None of the potential jurors expressed any concerns about their safety or the defendants having access to their personal information. Similarly, at the close of Warren's voir dire examination, defense counsel specifically gave the jury pool the opportunity to discuss anything that they thought would prevent them from acting as fair and impartial jurors, but none responded.

The district court subsequently granted the prosecutor's motion to strike C.W. for cause but denied the defendants' motion for mistrial, finding that while the jury pool may have visibly reacted to the potential juror's comments, "the record should be perfectly clear no one was nodding their head in agreement, no one was raising their hand to come forward, no one anticipated any further questions when the broadest possible question was asked, is there anything we should know about?" The district court found that if any member of the jury pool had concerns for their safety, or believed such concerns would prevent them from serving as a fair and impartial juror, they had ample opportunity to express their concerns. The district court therefore concluded that a mistrial was not appropriate.

Moore claims on appeal that C.W.'s comments irreparably tainted the jury panel and the district court's curative instruction did not purge the taint.

*Standard of Review*

We review a district court's decision denying a motion for mistrial for an abuse of discretion. *State v. Armstrong,* 299 Kan. 405, 442, 324 P.3d 1052 (2014). A district court abuses its discretion if its decision is (1) arbitrary, fanciful, or unreasonable; (2) based on an error of law; or (3) based on an error of fact. *State v. Waller,* 299 Kan. 707, 722, 328 P.3d 1111 (2014).

*Analysis*

Pursuant to K.S.A. 22-3423(1)(c), a district court may declare a mistrial if prejudicial conduct, inside or outside the courtroom, makes it impossible for the trial to proceed without injustice to the prosecution or defense. When evaluating a motion for mistrial under this provision, the district court must take the first step of deciding whether the prejudicial conduct created a fundamental failure in the proceeding. If so, the district court's second step is to decide whether the prejudicial conduct made it impossible to continue the proceeding without denying the parties a fair trial. *Armstrong*, 299 Kan. at 441-42. Under the second step, the court considers whether the conduct caused prejudice that could not be cured or mitigated through jury admonition or instruction, resulting in an injustice. *State v. Ward*, 292 Kan. 541, 551, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012).

The question of whether a fundamental failure in the proceeding existed "varies with the nature of the alleged misconduct, such as whether the allegation is based on the actions of a witness, the actions of a bystander, prosecutorial misconduct, or evidentiary error." 292 Kan. 541, Syl. ¶ 4. Here, we are dealing with a potential juror's actions in expressing fear of retribution from the defendants. Although we have yet to address the precise issue presented here, we have considered cases involving a potential juror's prejudicial statements in the presence of the jury pool.

For example, in *State v. McCorgary*, 224 Kan. 677, 687, 585 P.2d 1024 (1978), a potential juror, who also happened to be the defendant's cousin, "expressed a strong feeling in front of other prospective jurors that what she had read in the paper about these murders was true." The potential juror was excused from service, but the defendant moved for a mistrial before voir dire was completed. The motion was denied, but the jury was instructed to disregard statements by prospective jurors and to not consider what they may have read in newspapers. On appeal, we held that the district court did not abuse its discretion in denying the motion for a mistrial because there was no evidence that the defendant's rights had been substantially prejudiced. 224 Kan. at 687.

Similarly, in *State v. Mayberry*, 248 Kan. 369, 380, 807 P.2d 86 (1991), *disapproved on other grounds by State v. Gunby*, 282 Kan. 39, 144 P.3d 647 (2006), the defendant argued that the trial court erred in denying his motion for a mistrial based upon a potential juror's statement that he knew about the defendant from his previous conviction. The juror was excused for cause, and the district court instructed the jury to disregard any information concerning the case other than the evidence presented at trial. Once again, we held that the district court did not abuse its discretion in denying the motion for mistrial because there was no showing of substantial prejudice to the defendant's right to a fair trial. 248 Kan. at 381.

More recently, in *State v. Betancourt*, 299 Kan. 131, 322 P.3d 353 (2014), a potential juror, during voir dire, disclosed that she had heard that the murder case was gang related. Prior to voir dire, the district court had granted a motion in limine precluding any evidence of gang membership during the trial. The defendant moved for a mistrial based on a violation of the order in limine and because the jury panel was allegedly tainted. The district court denied the motion for mistrial. Citing cases from other jurisdictions dealing with prospective jurors' prejudicial comments during voir dire, we held that the district court did not abuse its discretion in denying the motion for mistrial because there was no prejudice to the other jury members. 299 Kan. at 146. We reasoned:

"[T]he juror mentioned gang involvement only in passing, and the topic was not brought up again. The defense did not ask for permission to conduct an examination of the jury for prejudice and did not request an instruction directing the jury to disregard unsworn statements by jury members. Furthermore, the defense did not seek to strike the juror in question for cause." 299 Kan. at 146.

On the other side of the argument, Moore points to *State v. Yurk*, 230 Kan. 516, 638 P.2d 921 (1982). There, during the course of an aggravated robbery trial, a juror read a newspaper article, which revealed that Yurk had three prior convictions related to larcenous activities. The juror initially stated that his ability to be fair and impartial would be affected by the newspaper article, explaining " 'the main thing that bothered me were the other charges that had been filed against the man and the convictions.' " 230 Kan. at 520. However, under further questioning by the trial judge, the

juror stated he could render a fair decision, prompting the trial court to deny the defense motion for mistrial and to proceed with the trial. The *Yurk* majority found that the district court erred in denying the mistrial and continuing the trial because the single juror involved admitted that he was adversely influenced by the knowledge of defendant's prior convictions, and the juror's subsequent assurances of fairness could not protect the defendant's right to a fair trial. 230 Kan. at 523-24.

The *Yurk* court was concerned with the impartiality of a single juror who improperly read forbidden and prejudicial information about defendant's prior convictions during the course of the trial and admitted that the information bothered him. Here, we have no evidence that the impartiality of any sitting juror was actually prejudiced. Rather, Moore surmises that the actual jurors might have been adversely affected by overhearing the comments of an excused potential juror, notwithstanding the total absence of any direct statements of such influence. In other words, our circumstance more closely resembles that in *McCorgary, Mayberry,* and *Betancourt,* where we found the respective jury pool was not tainted by a venireperson's prejudicial comment and, consequently, no abuse of discretion in the district court's denial of a mistrial.

In this case, the district court noted that no one in the jury pool appeared to agree with C.W.'s comments and that no one expressed any similar personal safety concerns when asked if there was anything the parties or court should know about. Pointedly, Moore's counsel did not request an individual polling of the jury pool to investigate the existence of any prejudice. In short, there is no evidence of record indicating that the jury pool was, in fact, prejudiced by C.W.'s comments. Therefore, we conclude that the district court did not abuse its discretion in determining that C.W.'s comments did not constitute a fundamental failure in the proceedings.

Notwithstanding the foregoing holding, we pause to note that the district court in this case took the appropriate curative and mitigation measures to assure that Moore suffered no injustice from C.W.'s remarks. Moore's assertion that *United States v.*

*Blitch*, 622 F.3d 658 (7th Cir. 2010), required the district court to *sua sponte* poll the jury pool is unavailing because of the factual distinction that the persons expressing personal safety fears in *Blitch* actually sat as jurors in the case. Our circumstance is more analogous to that in *United States v. Small*, 423 F.3d 1164 (10th Cir. 2005), where a venireperson expressed doubt as to his impartiality because of safety concerns based on the number of marshals present in the courtroom. The district court denied a defense motion for mistrial, but explained to the jury pool that the number of marshals was due to the number of defendants, not to concerns about potential violence. The *Small* Court upheld the denial of defense counsel's mistrial motion, finding that "[a]ny prejudice that may have resulted from the statement of the venireperson was adequately addressed by the district court's explanation of the presence of the marshals in the courtroom." 423 F.3d at 1180. Here, the district court adequately explained the use of the jury questionnaires.

In short, we find that the district court did not abuse its discretion in denying Moore's motion for mistrial.

## MOTION TO SUPPRESS LINEUP IDENTIFICATION NOT PRESERVED

Moore next argues the district court violated his due process rights when the court denied his motion to suppress evidence of Brandon's lineup identification of Moore. He also asserts that Brandon's subsequent identifications of Moore should have been suppressed because of the lineup procedure utilized by the police.

### Standard of Review

Moore argues that because the district court did not make factual findings when denying his motion to suppress, our standard of review is de novo. But we review a challenge to an eyewitness identification as a due process issue involving mixed questions of fact and law. We apply a substantial competent evidence standard to the district court's factual findings and review de novo the legal conclusion drawn from those facts. *State v. Cruz*, 297 Kan. 1048, 1058-59, 307 P.3d 199 (2013) (citing *State v. Corbett*, 281 Kan.

294, 304, 130 P.3d 1179 [2006]). The district court's lack of factual findings does not alter our standard of review. See *State v. Neighbors*, 299 Kan. 234, 240, 328 P.3d 1081 (2014) (holding Court of Appeals erroneously applied de novo review for motion to suppress evidence under the Fourth Amendment when district court had not made factual findings).

*Moore's issue is not preserved for review.*

A district court employs a two-step process to determine whether an eyewitness identification is admissible evidence: "The first step examines whether the police procedure used to obtain the original out-of-court identification was unnecessarily suggestive. If so, the analysis moves to the second step of considering whether there was a substantial likelihood of misidentification under the totality of the circumstances." *Cruz*, 297 Kan. 1048, Syl. ¶ 2. Here, the district court found "that lineup was not unnecessarily suggestive" and denied the motion to suppress. Moore argues the police actions during the photo lineup procedure were highly suggestive, and the district court erred in finding otherwise. Furthermore, he argues the procedure led to a substantial likelihood of misidentification.

The State argues that Moore's lineup suppression issue is not properly before this court because Moore did not object when the State sought to admit the six-person lineup from which Brandon identified Moore into evidence. The State also points out that Moore did not object to any of the testimony about the lineup identification. Furthermore, Moore did not object to any of the testimony regarding Brandon's subsequent identifications.

K.S.A. 60-404 provides that a verdict will not be set aside "by reason of the erroneous admission of evidence unless there appears of record objection to the evidence timely interposed and so stated as to make clear the specific ground of objection." Pursuant to this statute, "evidentiary errors shall not be reviewed on appeal unless a party has lodged a timely and specific objection to the alleged error at trial." *State v. King*, 288 Kan. 333, 349, 204 P.3d 589 (2009); see also *State v. Godfrey*, No. 109,086, 2015 WL 3439127, at *2 (Kan. 2015) ("Without a contemporaneous objection, [de-

fendant's] claim is being asserted for the first time on appeal and is subject to the general rule that alleged constitutional violations cannot be raised for the first time on appeal.").

Despite this general rule, Moore argues two exceptions allow us to consider his constitutional issue for the first time on appeal. See *State v. Dukes*, 290 Kan. 485, 488, 231 P.3d 558 (2010) (listing three exceptions to the general rule that a constitutional issue will not be heard for the first time on appeal). Moore first argues that his issue involves only a question of law arising on proved or admitted facts and is determinative of his case. But Moore's argument is premised upon contested facts. For example, in support of his motion to suppress, Moore relied upon Brandon's preliminary hearing testimony. There, Brandon testified that the police told him that they had located the second suspect but just needed Brandon to confirm they had the right person and further that the police showed him an individual photograph of Moore. But at the hearing on Moore's motion to suppress, the State proffered that the officer who prepared the six-person lineup would testify that he did not tell Brandon that the suspect was in the six-person lineup and that the only photographs he showed Brandon were those contained in the six-person lineup. Therefore, the exception for an issue involving only a question of law does not apply.

Moore additionally argues this court should apply an exception because consideration of his claim is necessary to prevent the denial of a fundamental right. Since *King*, however, we have applied the timely and specific objection requirement even in cases where an evidentiary claim involved a defendant's constitutional rights. See *State v. Shadden*, 290 Kan. 803, 840-41, 235 P.3d 436 (2010). We have held that if we were to overlook the lack of objection in such circumstances, "these and other caselaw exceptions would soon swallow the general statutory rule." *State v. Richmond*, 289 Kan. 419, 429-30, 212 P.3d 165 (2009).

Given that Moore failed to preserve his challenge to the lineup identification, we decline to consider the issue for the first time on appeal.

## FAILURE TO DISCLOSE EVIDENCE

Next, we consider Moore's contention that the district court erred when it denied his motion for mistrial and motion for new trial. Both arguments are based upon Brandon's changed testimony at trial regarding his whereabouts when the shootings started. Moore argues that the prosecution may have known about Brandon's changed recollection before trial and, therefore, a *Brady v. Maryland,* 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), violation may have occurred. Moore argues that had the prosecutor informed him of Brandon's changed recollection, he would have been able to investigate Brandon's evolving stories, including interviewing his fellow inmates. Moore claims these interviews would have led to information counsel received after the trial in letters from inmates asserting that Brandon told the inmates he did not know who committed the murders.

Under K.S.A. 22-3423(1)(c), a district court may declare a mistrial if prejudicial conduct, inside or outside the courtroom, makes it impossible for the trial court to proceed without injustice to the prosecution or defense. And under K.S.A. 2014 Supp. 22-3501, a district court may grant a new trial to the defendant "if required in the interest of justice."

*Standard of Review*

We review a district court's decision denying a motion for mistrial for an abuse of discretion. *Armstrong,* 299 Kan. at 442. Likewise, we review a trial court's ruling on a motion for new trial for an abuse of discretion. *State v. Warrior,* 294 Kan. 484, 505, 277 P.3d 1111 (2012). A district court abuses its discretion if its decision is (1) arbitrary, fanciful, or unreasonable; (2) based on an error of law; or (3) based on an error of fact. *Waller,* 299 Kan. at 722.

Additionally, Moore's arguments in support of his motion for mistrial and motion for new trial are premised upon the prosecution committing a *Brady* violation. We have held that "a trial court's determination as to the existence of a *Brady* violation is reviewed de novo with deference to a trial court's findings of fact, but the trial court's denial of the defendant's motion for new trial is re-

viewed under an abuse of discretion standard." *Warrior*, 294 Kan. at 510.

*Analysis*

Moore argues that the trial court erred in denying both his motion for mistrial and motion for new trial because "it appears that a *Brady* violation may have occurred." In *Brady*, the United States Supreme Court held that "prosecutors have a positive duty to disclose evidence favorable to the accused when 'the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.' " *Warrior*, 294 Kan. at 505-06 (quoting *Brady*, 373 U.S. 87). Favorable evidence includes both exculpatory and impeachment evidence. *Warrior*, 294 Kan. at 506 (citing *Strickler v. Greene*, 527 U.S. 263, 281-82, 119 S. Ct. 1936, 144 L. Ed. 2d 286 [1999]).

Moore argues that the State failed to notify the defense about Brandon's changed recollection of his whereabouts when the shooting started. As this case progressed, Brandon related at least three different accounts of the event. He initially told the police that he was walking to the drug house when people started shooting at him. Later that day, Brandon related that he was in the bathroom when he heard gunshots. At the preliminary hearing, Brandon again recalled that he was in the bathroom when he heard the gunshots. But at trial, Brandon testified that he was in the living room when the shooting started. When Moore's defense counsel asked Brandon if he had told anyone at the police department about his changed recollection, Brandon testified that he had told the prosecutor in February, approximately 8 months before trial.

Three essential elements are required to establish a *Brady* violation: "(1) The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) that evidence must have been suppressed by the State, either willfully or inadvertently; and (3) the evidence must be material so as to establish prejudice." *Warrior*, 294 Kan. 484, Syl. ¶ 10. Under element one, the evidence at issue was impeaching because the eyewitness' trial testimony varied from his pretrial accounts. Nev-

ertheless, Moore's argument fails under the remaining elements of a *Brady* claim.

As to whether the State suppressed the evidence of Brandon's changed testimony, Moore argues that "[a]t a minimum, the [district] court should have conducted a hearing to determine whether the state was aware of Brandon's [] new story before trial." But as the State points out, the district court considered this issue before ruling on the motion for mistrial. In arguing the motion, defense counsel candidly told the district court that the attorney did not believe Brandon had previously told the prosecutor about the changed testimony. In turn, the prosecutor also informed the trial court, "[O]bviously I didn't know he was going to testify that way," pointing to her opening statement, where she referenced Brandon's pretrial version of his whereabouts when the shootings started. In denying the motion, the district court found, "I would give your motion more consideration if there'd been a statement given where he changed the story back in February . . . and the State had a statement and never turned it over to you." In other words, the district court found that the State did not have the evidence prior to trial, and, therefore, the State could not have suppressed it, and Moore has failed to meet the second element.

Furthermore, under element three, the evidence was not material. In *Warrior*, this court held that the third element is evaluated under the reasonable probability test, which asks: "[D]oes the evidence put the whole case in such a different light as to undermine confidence in the verdict?" 294 Kan. at 511. Although not using this verbiage, the district court stated, "[Q]uite frankly, I think the third or fourth version that he's given of the story might help your client." Moreover, defense counsel extensively cross-examined Brandon about this inconsistency in his account, providing another avenue of defense for Moore. Accordingly, Brandon's last account of his whereabouts when the shootings began did not put this case in such a different light as to undermine confidence in the verdict.

Given Moore's inability to establish the elements of a *Brady* violation, the district court obviously did not abuse its discretion in

denying the motions for mistrial and new trial which were based solely on *Brady*.

## CHAIN OF CUSTODY

Moore next claims that the district court should not have admitted the evidence relating to the Glock handgun because the State failed to establish a proper chain of custody between its discovery in the air duct of the house where Moore was located and the evidence repository in Kansas City, Kansas. Moore argues that the State failed to show with a reasonable certainty that the Glock had not been materially altered after it was collected by the Kansas City, Missouri, police. More specifically, he argues that no evidence established how the Glock "was collected, who did it, whether it was packaged, what it was packed or stored with, or where it was stored after it was taken from the house in Kansas City, Missouri and before the Kansas City, Kansas police picked it up."

*Standard of Review*

"A district judge's determination of whether there is a reasonable certainty that a piece of evidence has not been materially altered is reviewed for abuse of discretion." *State v. Frierson*, 298 Kan. 1005, 1016, 319 P.3d 515 (2014).

*Analysis*

*State v. Horton*, 283 Kan. 44, 62, 151 P.3d 9 (2007), sets forth the relevant legal standard for chain of custody issues:

"A party offering an object into evidence must show with reasonable certainty that the object has not been materially altered since the object was taken into custody. However, the party is not required to keep the object under lock and key or continuously sealed up. The test for chain of custody is a reasonable certainty that the object has not been materially altered. Any deficiency in the chain of custody goes to the weight of the evidence rather than its admissibility."

Here, Moore's argument on admissibility suffers from a lack of evidentiary support; the record shows that the State met its evidentiary burden. Before the Glock was admitted into evidence, Officer Dion Dundovich of the Kansas City, Kansas, police department testified that he participated in the search of the Kansas City, Missouri, home where the Glock was found. Dundovich ex-

plained that guns and drugs, including the Glock in question, were found in an air duct in the house. Although another detective discovered the Glock, Dundovich testified that the handgun was in substantially the same condition as when it was recovered from the air duct. Dundovich testified that the Kansas City, Missouri, crime scene unit initially had custody of the Glock and took it to that department's property room.

After the Glock was admitted into evidence, Detective Darren Koberlein testified that he picked up the Glock from the Kansas City, Missouri, property room and brought it to the Kansas City, Kansas, property room. Further, Dundovich testified that he then transported the Glock from the Kansas City, Kansas, property room to the KBI. And finally, the KBI forensic scientist and firearm's expert both testified to examining the Glock recovered from the Missouri house.

Notwithstanding that part of the testimony came after the trial court had admitted the Glock into evidence, the record convinces us that the State proved to a "reasonable certainty that the object ha[d] not been materially altered" after its initial discovery. *Horton*, 283 Kan. at 62. Accordingly, any deficiency in the chain of custody goes to the weight of the evidence, not its admissibility. We find no abuse of discretion.

### EYEWITNESS IDENTIFICATION INSTRUCTION

Moore also argues the district court erred when it instructed the jury to consider the degree of certainty demonstrated by Brandon at the time of his identification of Moore, as a factor of the reliability or accuracy of the identification.

#### Standard of Review

Because Moore did not object to the instruction he now challenges, this court applies the clearly erroneous rule. *State v. Clay*, 300 Kan. 401, 410, 329 P.3d 484 (2014).

"To determine whether a given instruction was clearly erroneous, we first determine whether the instruction was erroneous. This is a legal question subject to de novo review. If we find error, we then determine whether reversal is required. Reversal is required only if we are firmly convinced the jury would have reached a different verdict absent the error. We have unlimited review over the reversi-

bility determination and, in conducting that review, we examine the entire record as a whole. The defendant bears the burden of establishing clear error under K.S.A. 22-3414(3). *State v. Williams*, 295 Kan. 506, 515-16, 286 P.3d 195 (2012)." *State v. Dobbs*, 297 Kan. 1225, 1237, 308 P.3d 1258 (2013).

*Analysis*

The challenged instruction was modeled after PIK Crim. 3d 52.20 and stated:

"The law places the burden upon the State to identify the defendants. The law does not require the defendant to prove he has been wrongly identified. In weighing the reliability of eyewitness identification testimony, you first should determine whether any of the following factors existed and, if so, the extent to which they would affect accuracy of identification by an eyewitness. Factors you may consider are:

"1. The opportunity a witness had to observe. This includes any physical condition which could affect the ability of the witness to observe, the length of the time of observation, and any limitations on observation like an obstruction or poor lighting;

"2. The emotional state of the witness at the time, including that which might be caused by the use of a weapon or a threat of violence;

"3. Whether the witness had observed the defendant on earlier occasions;

"4. Whether a significant amount of time elapsed between the crime charged and any later identification;

"5. Whether the witness ever failed to identify the defendant or made any inconsistent identification;

"6. *The degree of certainty demonstrated by the witness at the time of any identification of the accused*; and

"7. Whether there are any other circumstances that may have affected the accuracy of the eyewitness identification." (Emphasis added.)

In *State v. Mitchell*, 294 Kan. 469, 481, 275 P.3d 905 (2012), we reaffirmed that a trial court is required to issue a cautionary instruction when an eyewitness' identification testimony is critical to the prosecution's case. Nevertheless, we also held that including the degree of certainty factor in the instruction is erroneous because the factor "prompts the jury to conclude that an eyewitness identification is more reliable when the witness expresses greater certainty." 294 Kan. at 481; see also *Cruz*, 297 Kan. at 1068 ("[A] trial court errs by instructing the jury on the reliability of eyewitness identification by using PIK Crim. 3d 52.20 without omitting

the degree of certainty factor."). The State concedes that it was error to instruct the jury on this factor.

Because there was error, we must next determine if the error requires reversal of Moore's convictions. Moore did not object; therefore, he "faces the high burden of convincing us that the inclusion of the degree of certainty factor in the eyewitness identification cautionary instruction was clearly erroneous, *i.e.*, that we are firmly convinced that the jury would have reached a different verdict had the instruction not included the erroneous language." *Cruz*, 297 Kan. at 1068; see *Williams*, 295 Kan. 506, Syl. ¶ 5.

Regardless of whether a defendant objects to the degree of certainty factor error, we employ the same initial questions: "(1) Was the identification crucial to the State's case? and (2) Was there an opinion of certainty stated?" *Cruz*, 297 Kan. at 1068 (citing *Marshall*, 294 Kan. at 867-68). In Moore's case, the answer to both initial questions is "yes."

With regard to the first question, the State concedes Brandon's identification was crucial to its case. Brandon was the only witness who placed Moore at the crime scene. Granted, the State presented some physical evidence linking Moore to the crime scene through the Glock, albeit the forensic scientist testified that the DNA profile from the Glock was "pretty common." Brandon's identification of Moore was obviously critical to the State's case. See *Marshall*, 294 Kan. at 868 (noting that the State's cases "rested almost entirely on" the identification, although footprint evidence appearing to match the defendant's shoes also linked him to the crime scene).

With regard to the second question, we agree with Moore that certainty evidence was submitted to the jury. During cross-examination, while trying to detract from the reliability of Brandon's identification of Moore, Moore's counsel evoked certainty evidence. Brandon admitted to seeing a color photograph of Moore before he was shown a six-person lineup. Brandon further testified that he was shown a second lineup containing a more recent photo of Moore. Brandon indicated that when he saw the first lineup containing Moore's photo, he told the police "that the person looks like the person that was in the house" but with a different hairstyle.

He explained that he "want[ed] to say it is that person, but if you can get me a picture that actually shows what the person looks like, I'll be able to be better off to clarify my decision." On cross-examination, Brandon admitted that he was not "for sure" that the person in the lineup was the man from the crime scene until he saw a more recent picture. Later in the cross-examination, Brandon again indicated that before he saw a more recent picture of Moore, he "was positive, but [he] just couldn't say yeah, that's the person and been wrong or something." In short, the witness in this case opined on his certainty of identification.

The State argues that Moore invited the error by eliciting the certainty testimony during cross-examination of the State's witness. But impeaching the credibility of a State's witness is an essential function of defense counsel; it is not an invitation for the court to give an erroneous jury instruction.

But an affirmative answer to both initial questions does not end our inquiry. *Cruz*, 297 Kan. at 1069 (citing *Marshall*, 294 Kan. at 868). We must next "consider the impact of the jury instruction in light of the entire record and additional considerations." *Marshall*, 294 Kan. at 868. "This particular review requires consideration of procedural safeguards and the total amount of inculpatory evidence." *Briseno*, 299 Kan. at 886. With regard to procedural safeguards, we have explained:

"Those safeguards include, but are not limited to, [1] the defendant's constitutional right to confront the witnesses against him or her; [2] the defendant's constitutional right to effective assistance of counsel ' "who can expose the flaws in the eyewitness' testimony during cross-examination and focus the jury's attention on the fallibility of such testimony during opening and closing arguments" '; [3] eyewitness-specific jury instructions that ' "warn the jury to take care in appraising identification evidence" '; and [4] the constitutional requirement that the State prove every element of the crime beyond a reasonable doubt. *Marshall*, 294 Kan. at 868-69 (quoting *Perry v. New Hampshire*, 565 U.S. 228, 132 S. Ct. 716, 728-29, 181 L. Ed. 2d 694 [2012])." *Dobbs*, 297 Kan. at 1238-39.

The other procedural safeguards present in *Cruz* and *Marshall* included "a rigorous cross-examination of the identifying witness and a closing argument that 'methodically reminded the jury of all the inconsistencies.' " *Cruz*, 297 Kan. at 1069 (discussing *Mar-*

*shall*). Both were present here. Defense counsel's cross-examination elicited the following testimony: Brandon's identification was made through a crack in a bedroom door while Brandon was aiming his weapon at the suspect; Brandon had never seen Moore prior to the events in question; Brandon saw a color photo of Moore before he identified Moore in the lineup; and Brandon was uncertain about his identification until he was shown a more recent photo.

During closing argument, defense counsel discussed the inconsistencies in Brandon's testimony as well as the factors detracting from the accuracy of Brandon's identification. Defense counsel stressed that Brandon only saw the suspect through a crack in the door while trying to aim his weapon. He also reiterated that Brandon did not know Moore before the events in question. Finally, defense counsel reminded the jury that Moore was presumed innocent and argued that the State had not met its burden of proving him guilty beyond a reasonable doubt.

Moreover, as in *Cruz* and *Marshall*, although Brandon's identification of Moore was the strongest evidence linking Moore to the crime, it was not the State's only evidence. *Cruz*, 297 Kan. at 1069-70; *Marshall*, 294 Kan. at 870. Police found the Glock in the house where Moore and Warren were apprehended, two cartridges fired from the Glock were found under Charles' body, and DNA samples taken from the Glock were consistent with Moore's DNA profile.

Accordingly, we are "*not* firmly convinced that, if the eyewitness identification cautionary instruction had not included the direction to consider degree of certainty in determining the reliability of the identification, the jury would have reached a different verdict, *i.e.*, declined to convict him." *Cruz*, 297 Kan. at 1070. Consequently, the instruction was not clearly erroneous.

## CUMULATIVE ERROR

Alternatively, Moore argues that pursuant to the cumulative error doctrine he is entitled to a new trial. Even if an individual error is insufficient to support a reversal, the cumulative effect of multiple errors may be so great as to require the reversal of a defend-

ant's conviction. *State v. Edwards*, 291 Kan. 532, 553, 243 P.3d 683 (2010).

Above, we agreed with one of Moore's assertions of error—the district court erred in instructing the jury to consider the degree of certainty in the eyewitness identification cautionary instruction. We rejected each of Moore's remaining claims. One error does not constitute cumulative error. *State v. Foster*, 290 Kan. 696, 726, 233 P.3d 265 (2010). Therefore, Moore has not established the applicability of the cumulative error doctrine.

## SENTENCING ISSUES

Finally, Moore raises two sentencing issues. First, he asks us to vacate his hard 50 life sentence, arguing that K.S.A. 21-4635, the hard 50 statute in effect at the time of his sentencing, is unconstitutional because it denies a defendant his or her Sixth Amendment right to have a jury decide, beyond a reasonable doubt, all of the facts necessary to increase the penalty for first-degree murder. Second, Moore argues, and the State concedes, that the district court erred by ordering lifetime postrelease supervision, instead of parole. See K.S.A. 22-3717(b); *State v. Clay*, 300 Kan. 401, 418, 329 P.3d 484 (2014) (offenders sentenced for certain off-grid crimes subject to parole, not postrelease supervision).

Because we hold that Moore's sentence was imposed in violation of his constitutional right to a jury trial and that such error was not harmless, we vacate his hard 50 sentence and remand for resentencing. That holding renders moot the remaining claim of sentencing error, which can be corrected on resentencing. See *State v. Salary*, 301 Kan. 586, 608-09, 343 P.3d 1165 (2015) (declining to address additional sentencing issue as moot, once hard 50 sentence vacated for violating United States Constitution).

### Standard of Review

Determining a statute's constitutionality is a question of law subject to unlimited review. *State v. Soto*, 299 Kan. 102, Syl. ¶ 8, 322 P.3d 334 (2014).

*Analysis*

At the time of Moore's conviction, K.S.A. 21-4635 set forth a procedure whereby the State could seek enhancement of the minimum sentence for premeditated first-degree murder to 50 years before the convict is parole eligible. As a prerequisite to the enhanced sentence, the State had to prove and the sentencing court had to find the existence of one or more statutorily enumerated aggravating factors. K.S.A. 21-4635. In this case, the district court found that Moore knowingly or purposely killed or created a great risk of death to more than one person, K.S.A. 21-4636(b); that Moore committed the crime for the purpose of receiving money or other things of monetary value, K.S.A. 21-4636(c); and that Moore authorized or used another person to commit the crime, because a third person drove the getaway car, K.S.A. 21-4636(d).

The statutory scheme then required the district court to determine whether there were any mitigating circumstances present and, if so, whether they outweighed the aggravating factors. K.S.A. 21-4635(d).

At the sentencing hearing, Moore's counsel opposed the hard 50 sentence, arguing that there was insufficient evidence supporting each of the three aggravating factors. With regard to killing or creating a great risk of death to more than one person, Moore's counsel argued no evidence established that Moore brought a gun into the house or that he shot anyone. With regard to committing the crime for himself or others for the purpose of receiving money or other things of monetary value, Moore's counsel argued there was no evidence that any cash, drugs, guns, or ammunition were taken from the crime scene. With regard to authorizing or using another person to commit the crime, Moore's counsel argued that Brandon's testimony regarding a third person driving the getaway vehicle did not show the existence of the aggravating circumstance with the degree of specificity required to impose an enhanced sentence. Moore's counsel did not argue any mitigating circumstances to weigh against the State's allegation of aggravating circumstances, albeit the district court determined that Moore's young age and his lack of criminal history constituted mitigating circumstances.

Ultimately, the district court imposed a hard 50 life sentence for the premeditated first-degree murder conviction. The court found the existence of each of the aggravating circumstances alleged by the State and determined that the mitigating circumstances did not outweigh the aggravators.

In *Soto*, which was issued after Moore filed his brief in this case, we determined that Kansas' hard 50 sentencing statute was unconstitutional pursuant to the United State's Supreme Court's ruling in *Alleyne v. United States*, 570 U.S. ___, 133 S. Ct. 2151, 2160-63, 186 L. Ed. 2d 314 (2013). *Soto*, 299 Kan. at 124. *Alleyne* held that a person's right to a jury trial under the Sixth Amendment to the United States Constitution requires that any fact increasing a mandatory minimum sentence for a crime must be proved to a jury beyond a reasonable doubt. Given that our hard 50 procedure allowed a judge to find the existence of one or more aggravating factors, instead of requiring a jury to find those factors beyond a reasonable doubt, that procedure was unconstitutional as violative of the Sixth Amendment. *Soto*, 299 Kan. at 124. The same unconstitutional procedure was used in this case, *i.e.*, the sentencing judge, not the jury, made the specific factual findings of aggravating circumstances and did the balancing against mitigating circumstances that resulted in an increased mandatory minimum sentence for Moore.

The State has acknowledged *Soto's* holding; but it relies upon *Soto's* statement that "only in a rare instance could a hard 50/ *Alleyne* error be harmless," to argue that Moore's sentence represents that rare instance. See 299 Kan. at 127. Granted, *Soto* did describe a harmless error test that would require the appellate court to find, beyond a reasonable doubt, that (1) the uncontroverted and overwhelming evidence supported the aggravating circumstance such that the jury would have found the existence of the aggravating circumstance beyond a reasonable doubt; and (2) "that no rational jury would have determined that any mitigating circumstances outweighed any aggravating circumstances." *Soto*, 299 Kan. at 126-27.

Nevertheless, *Soto* declined to definitively decide whether a hard 50/*Alleyne* error could ever be harmless because even assum-

ing the applicability of a harmlessness analysis, the error in Soto's case did "not come close to meeting that test." 299 Kan. at 126. Specifically, *Soto* opined that even if overwhelming and uncontroverted evidence established the existence of an aggravating factor, this court could not conclude beyond a reasonable doubt "that no rational jury would have determined that the mitigating circumstance outweighed the aggravating circumstance." 299 Kan. at 127; see also *State v. Hilt*, 299 Kan. 176, 205, 322 P.3d 367 (2014) (assuming without deciding that harmlessness applies but concluding case did not present "one of the rare instances when a hard 50 *Alleyne* error can be declared harmless"). Likewise, the case before us does not justify our presuming to read the collective mind of a hypothetical jury to find, beyond a reasonable doubt, that it would have determined that mitigating circumstances did not outweigh aggravating factors. In other words, this is not one of the rare cases to which *Soto* alluded.

The State contends that this case is different because Moore failed to present any evidence of mitigating factors at the sentencing hearing so no weighing was necessary. But as we noted, the district court engaged in a balancing of the aggravators against the mitigators, which it determined to be Moore's young age and his lack of criminal history. Evidence of those mitigators was contained in the presentence investigation report (PSI), *i.e.*, the record contains evidence of mitigating factors. A jury would have been free to consider those factors as well, and we continue to avoid predicting the result of that consideration.

In conclusion, we hold that the sentencing scheme under which Moore was sentenced was unconstitutional, and we decline to declare that such unconstitutionality was harmless in this case. Moore's hard 50 sentence is vacated, and the matter is remanded for resentencing.

Convictions affirmed, hard 50 life sentence vacated, and case remanded for resentencing.