NOT DESIGNATED FOR PUBLICATION

No. 121,448

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

TYRONE J. CARVIN,
*Appellant*.


MEMORANDUM OPINION

Appeal from Douglas District Court; SALLY D. POKORNY, judge. Opinion filed April 9, 2021.
Affirmed.

*James M. Latta*, of Kansas Appellate Defender Office, for appellant.

*Kate Duncan Butler*, assistant district attorney, *Charles E. Branson*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before SCHROEDER, P.J., MALONE, J., and MCANANY, S.J.

PER CURIAM:  Tyrone J. Carvin appeals his convictions of voluntary manslaughter, aggravated battery, and aggravated assault. Carvin challenges the sufficiency of the evidence supporting his voluntary manslaughter conviction and the propriety of instructing the jury on an aiding and abetting theory of liability. He also argues that allowing an unavailable witness' preliminary hearing testimony to be read into the record at trial violated his confrontation rights under the Kansas Constitution, the district court erred by denying his motion for mistrial, the prosecutor committed reversible error during closing argument, and cumulative error merits reversal of his

1

convictions. For the reasons explained in this opinion, we reject Carvin's claims and affirm the district court's judgment.

FACTUAL AND PROCEDURAL BACKGROUND

This case stems from a shooting at the Motel 6 in Lawrence that involved two groups of men. Cameron Hooks, Laroyce Thomas, and Dominick Frye suffered gunshot wounds while their friends Tanner Marlowe and Mathdaniel Squirrel avoided being shot. The identities of the other four men in the motel room were originally unknown. The Lawrence Police Department (LPD) undertook an extensive investigation and the State ultimately prosecuted three individuals for crimes related to the shooting: Carvin, Shawn Smith, and Ramone Singleton. The fourth man in the second group was later identified as SirEric Singleton (SirEric), Ramone's brother.

Carvin and Squirrel first met in 2016 in a juvenile correction center, and they remained friends and stayed in touch after their release. In July or August 2017, Squirrel brought Marlowe and Frye to Carvin's home in Kansas City, Kansas, and they all sat on the front porch and talked for about 30 minutes. Carvin had a friend there as well; he later stated he could not remember who it was, but Marlowe later identified that friend as Singleton. Frye showed Carvin a silver and black 9 mm Ruger he was trying to sell. According to Carvin, he agreed to buy it and they exchanged phone numbers.

Carvin later said that he went to Topeka and met with Frye to buy the gun, but Frye did not have the gun when Carvin arrived. Frye, on the other hand, said that Carvin texted him after they first met about buying the gun, but Frye never replied to the texts. In any event, that encounter was friendly.

On September 2, 2017, Frye, Squirrel, and Marlowe drove to Kansas City and went shopping. They then drove to Lawrence, where they planned to go to bars and a

2

strip club. Frye rented a room on the third floor at the Motel 6 in Lawrence, which is near Interstate 70. At about 7 or 8 p.m., they drove to Walmart, where they did some more shopping and met up with Thomas and Hooks. After they left Walmart, the men stopped at a liquor store, then headed back to the Motel 6.

Carvin later testified that at 9 or 10 p.m., he realized he had a Snapchat message from Squirrel inviting him to a strip club and saying Squirrel had a hotel room. Squirrel later testified that he had posted on Snapchat that he was in Lawrence and Carvin asked if he could join them. Carvin said he told Squirrel he was bringing his cousin, but Squirrel later said he did not know Carvin was bringing anyone with him. Either way, Carvin, Singleton, Smith, and SirEric headed to the motel.

*Carvin's version of events*

Carvin testified that when he, Singleton, Smith, and SirEric arrived at the Motel 6, Squirrel met them in the motel parking lot. Carvin introduced Squirrel to the others and they went inside. Once in the room, Carvin recognized Marlowe and Frye but he did not know Thomas or Hooks and had not anticipated they would be there. The gun Frye had been trying to sell him was sitting on the dresser in front of the television, and Carvin saw that Thomas had a black gun on his waist. Carvin saw a third gun, a black semiautomatic .380, sitting on the table. At one point, Frye asked if Carvin still wanted to buy his gun and when Carvin said he did, Frye said he would sell it to him at the end of the night. Frye passed the gun around the room, compared it with Thomas' gun, which Thomas had taken out, and then set it on the side of the bed. Carvin also saw a fourth gun in the room, near Marlowe, but Marlowe denied that it was his when Carvin asked him.

Thomas and Squirrel ordered pizza and then the men all drank, smoked, ate pizza, and watched a game on television for about 20 to 30 minutes. Carvin sat on the corner of the bed closest to the bathroom with Marlowe, Smith, and SirEric. Frye and Singleton sat

3

on the other bed and Thomas and Hooks were at the table. Carvin saw Squirrel talking with Hooks and Thomas, then Squirrel said he needed to get something out of the car and left the room. Right after that, Carvin heard someone get up and say, "'Run that shit.'" Singleton stood up and, when Carvin peeked around Singleton, he saw Hooks and Thomas standing up and pointing guns at them.

Carvin saw Singleton take off his necklace and begin to reach into his pocket, perhaps to give up his money. Carvin took off his watch to give to Hooks and Thomas as if it was a robbery. He heard either Hooks or Thomas say, "'Don't do it, don't do it, man.'" Then Carvin felt a sharp pain in his arm and saw Singleton run past him and out of the room, so he picked up a nearby gun and started shooting at Hooks and Thomas. He believed he shot four or five times, but he heard no gunshot, including his own, because his ears were ringing. Carvin was unsure whether any of his friends fired a gun, but he believed at the time that none of them had brought a gun to the room.

As he ran out of the room, holding his phone and watch and still carrying the gun, Carvin tripped and fell, but he continued to fire the gun behind him as he left the room. Carvin believed that he was the only person shooting at that time. He left the motel through a back door and fell again as he crossed the parking lot, dropping his watch. Carvin tried to drop the gun as well, but he was physically unable to loosen his grip on it. When Carvin joined Smith, Singleton, and SirEric in the car, Singleton drove them away.

*Frye's version of events*

According to Frye, after he, Squirrel, Marlowe, Hooks, and Thomas returned from the liquor store, Squirrel said he had invited a friend from Kansas City to come join them. Frye ordered pizza and when Squirrel went down to get the pizza, he returned with four men, three of whom Frye later identified as Carvin, Singleton, and Smith. Frye had a gun in a waistband holster under his shirt and he believed Thomas had a gun as well. Frye

4

noticed that none of the men from Kansas City seemed "dressed to go out"; one of them was wearing Nike slide sandals. The men from Kansas City were quiet and looked around the room as they all ate pizza, drank liquor, smoked marijuana, and talked.

According to Frye, just before the shooting, he was lying on the bed farthest from the door and closest to the window and Marlowe was sitting beside him. Hooks was walking to the refrigerator near the window. Thomas was at the refrigerator and Squirrel was pacing back and forth in front of both beds. Carvin, Smith, Singleton, and the fourth individual were sitting on the other bed in the room. Frye leaned over to pass a liquor bottle and he saw Carvin, Smith, Singleton, and the fourth individual "hop up quick. And there was no words said, and then gunfire." All four men from the Kansas City group had guns and "[t]wo of them was standing up on the bed, the other two was spraying."

Although Frye saw Carvin, Smith, Singleton, and the fourth individual pull out guns and he saw "a few different flashes, so [he knew] a few different guns started going off all at once," he could not say exactly who fired. But according to Frye, neither he nor Thomas fired back. Instead, Frye rolled over on the bed, covered his head, and prayed. Before he did, he saw Marlowe fall off the bed and get behind and partially underneath it and he saw Hooks and Thomas "trying to duck." Squirrel was no longer in the room. Frye heard one of the men from the Kansas City group repeat the word "'go,'" and he heard the door to the room close, so he got up and locked the door. He heard Marlowe call 911 and saw Hooks "coughing up chunks of blood." Although he at first denied it to police, Frye threw his pistol out of the window. He also moved Hooks onto one of the beds.

*Marlowe's version of events*

Marlowe's version of events generally aligned with Frye's. Although he had met Carvin and Singleton before in Kansas City, he did not know their names when he saw them again on the night of the shooting. Marlowe testified at trial that everyone was in

the motel room "just hanging out" when the four men from Kansas City stood up and someone—he believed but was "[n]ot exactly sure" that it was one of the men from Kansas City—said, "'Run it. Run it,'" which Marlowe testified means "'give us all your shit.'" In various statements to police officers and in his later trial testimony, however, Marlowe said that he also heard someone say, "'fuck you'" and that he remembered nothing being said before the shooting.

When the shooting began, Marlowe dove off the bed onto the floor. Like Frye, Marlowe was not sure who had fired, but he believed at least most of the shots came from the group of men from Kansas City. But Marlowe conceded Thomas might have fired a gun although Marlowe did not see him do so. Marlowe did not have a gun and he did not know whether Hooks, Frye, or Squirrel did, but he knew that Thomas was armed.

When the shooting stopped, Marlowe stood up and the men from Kansas City were gone, as was Squirrel. Thomas was on the floor by the table and Hooks and Frye were each on one of the beds. Although he at first lied to police about it, Marlowe eventually admitted that he then threw some marijuana out the window. He also saw Frye throw a gun out of the same window.

*Squirrel's version of events*

Squirrel met Carvin and his friends in the motel parking lot when they arrived, but he later testified that Carvin did not introduce his three companions and he had never met them before. Even so, the atmosphere was friendly, and everyone sat around the room, eating pizza, drinking, and smoking marijuana. Squirrel did not have a gun and he did not know whether Thomas, Marlowe, or Hooks had one. Squirrel knew that Frye had a gun, which he had placed on the table in the motel room. According to Squirrel, everyone's money and belongings were "just sitting out"; he compared it to being at home and taking everything out of your pockets to relax.

6

As they finished eating, Squirrel thought they were going to a nearby strip club, so he asked Frye, "'Are you ready?'" and Frye replied, "'Yes.'" Squirrel was going to wash his face at the sink near the door to the bathroom. Frye and Marlowe were on the bed in the corner, and Hooks and Thomas were near the window. One of the men from Kansas City came toward Squirrel with a gun and someone said, "'Give me everything' or 'Run everything,'" but Squirrel did not know who spoke or whether it was one or two people. He only knew it was not Hooks' voice, Frye's voice, Thomas' voice, or Marlowe's voice, and it was not the man pointing a gun at him. Squirrel heard a gunshot, so he ducked, swatted away the gun pointed at him, and ran out of the motel room. Squirrel was not shot, and he eventually made his way to the ground floor and out of the motel.

*Police investigation and arrests*

Just after 11:30 p.m., Marlowe called 911 and reported that three people had been shot in room 308 of the Motel 6. When asked who had shot his friends, Marlowe told the dispatcher that he did not know their names, but they knew a friend of his. Another male who did not identify himself also called 911 and reported that he was at Motel 6 in Lawrence and had been shot. That caller repeatedly stated that he did not know who had shot him and, at about 2 1/2 minutes into the call, the caller stopped responding to the dispatcher's questions and the dispatcher ended the call.

Many officers and detectives from the LPD responded to the motel. Officers found Thomas lying on the floor in the entryway being tended to by a woman—another guest at the motel—who had put a tourniquet on a gunshot wound to his leg. Marlowe, who was standing near the room's window talking on the phone with the 911 dispatcher, said he was not hurt. Hooks and Frye were lying on the beds in the room, and the responding officers began applying pressure to their gunshot wounds. Frye had suffered four gunshot wounds: one on each of his legs, one near his spine, and one in his left buttock. Two bullets remained in his body, one in his back and one in his buttock. Still, Frye gave

7

physical descriptions of men who had come from Kansas City to party with them whom Frye said had suddenly begun shooting. Frye also said that the men were wearing dark clothing and were driving a dark-colored Grand Prix. Frye said he had met them before at parties, but he did not know their names.

Hooks had been shot five times; each bullet had entered and exited his body. One bullet entered Hooks' left lower back, passed above his left kidney, went through his liver and diaphragm, and exited through his chest wall below his right nipple. Another bullet entered the back of Hooks' left forearm and exited through the front of his forearm. A third and a fourth bullet entered the left side of Hooks' back a bit above his waistline and exited through his abdominal wall. The fifth bullet entered the outside of Hooks' left thigh and exited the inside of his left thigh. Hooks, who was in and out of consciousness, also told police he did not know who the shooters were or why they had shot him.

When a detective asked Thomas who had shot him, Thomas said a "black male," but he did not know the man's name. Detective Kimberlee Nicholson, who would become the lead detective for the case, also asked each man who had been shooting. Thomas, Frye, and Hooks each said they did not know; Marlowe said it was four black men from Kansas City who were headed back to Kansas City.

Meanwhile, as they were driving down the highway away from Lawrence, Singleton helped Carvin loosen his grip on the gun he had fired and, at Carvin's direction, Singleton threw the gun out the window. SirEric and Singleton each threw their own guns out the window as well. According to Carvin, this was the first point at which he realized Singleton and SirEric had guns. Carvin told Singleton to take him to the hospital at the University of Kansas Medical Center (KU Med). They did not have enough gas to make it, so Singleton called his mother, Kiana Jones, who met them in Kansas City and took Carvin to KU Med. SirEric rode with Carvin and Jones, but when they got to KU Med,

only Carvin and Jones went inside. At KU Med, Carvin told Kansas City, Kansas police officers that he had been shot at 18th Street and Parallel in Kansas City, Kansas.

Back at the motel in Lawrence, Thomas left in an ambulance headed for KU Med to get further treatment. Frye was taken by ambulance to Stormont-Vail hospital in Topeka. Hooks was taken by ambulance to the Lawrence Municipal Airport to meet a Life Star helicopter, but he died on the way. After a later autopsy, Dr. Erik Mitchell, forensic pathologist and the Douglas County Coroner, concluded that Hooks' cause of death was multiple gunshot wounds, the mechanism of death was bleeding and internal blood loss, and the manner of death was homicide.

When law enforcement went to KU Med to interview Thomas, they learned that Carvin had been admitted with a gunshot wound as well. Although they did not think then that Carvin was involved in the Lawrence shooting, they took Carvin's picture and sent it to the detectives who were interviewing the other victims. Frye identified Carvin as one of the individuals who had shot him. Squirrel also identified Carvin as having been in the motel room.

Officers at the motel searched the parking lot and found a silver semiautomatic handgun, a black handgun, a bag of marijuana with the end torn off, and what looked like a blunt. They also found blood near the southeast corner of the motel and a blood trail between the motel's eastern door and the third floor. Crime scene technician Jana Ramsey collected the items from the parking lot, as well as a broken watch that Carvin later said was his. Inside the motel room, Ramsey collected 22 cartridge cases and 13 projectiles. There were more than 25 bullet holes in the motel room. Ten or 11 of the bullet holes were in the back wall of the room, which was the south wall, and Detective Zacharia Thomas determined that the bullets fired in the room generally traveled north to south.

9

The manager of the Motel 6 gave police access to the motel's surveillance camera footage. Detective M.T. Brown took the footage downloaded from the motel surveillance cameras and excerpted the relevant video, linking it into a linear video of the events as they happened and as they were picked up by the security cameras in hallways, in the lobby, and on the motel's exterior.

Through an intensive investigation that need not be detailed for purposes of this appeal, police focused on Carvin, Singleton, and Smith as suspects. Carvin was arrested on September 5, 2017. Smith was arrested on September 15, 2017, and Singleton was arrested on September 27, 2017. The State ultimately charged Carvin with the first-degree murder of Hooks under alternative theories of felony murder committed during the commission of aggravated robbery and intentional premeditated murder; one count of aggravated battery of Frye; one count of aggravated assault of Marlowe; and one count of attempted aggravated robbery or, in the alternative, aggravated assault of Squirrel. Carvin, Singleton, and Smith—who were charged with similar crimes—were tried at a single jury trial that began on August 13, 2018.

*Trial evidence*

During the trial, the State presented testimony from the dispatchers who received the initial 911 calls, as well as 3 LPD officers, 13 LPD detectives, and the crime scene technician. The State presented testimony from a sergeant and an officer with the KU Med Police Department; two officers with the Kansas City, Kansas Police Department; a retired state trooper; the United States Deputy Marshal who arrested Smith and Singleton; and the Kansas Bureau of Investigation latent print examiner, DNA analyst, and firearm and toolmark examiner who examined items related to this case. Also testifying for the State were the manager of the Motel 6, the paramedic firefighter who transported Thomas to KU Med, the registered nurse who treated Carvin's gunshot wound at KU Med, Singleton's mother, and the Douglas County coroner.

Frye and Marlowe each testified for the State. Because Squirrel was unavailable, the State read his preliminary hearing testimony into the record for the jury. Thomas did not testify; he invoked his Fifth Amendment right against self-incrimination to the judge, who excused him. The State introduced into evidence over 220 photographs; 3 diagrams; 2 lab reports; recordings of the 911 calls; the defendants' cell phone records; video footage from the motel, traffic light cameras, toll plaza cameras; and 3-D scans of the crime scene and the hallway outside. Much of the State's case consisted of identifying "the men from Kansas City" as Carvin, Singleton, and Smith.

At first, Carvin's defense largely consisted of calling officers and detectives to testify about internal inconsistencies in Marlowe's, Squirrel's, Thomas', and Frye's statements to police, as well as inconsistencies between Marlowe's and Frye's trial testimony and their prior statements. Carvin then testified on his own behalf, admitting that he, Smith, Singleton, and SirEric were at the motel during the shooting and reiterating his version of the relevant events as set forth above. On cross-examination, Carvin repeatedly denied any memory of speaking with LPD at KU Med.

Smith then testified on his own behalf. As relevant here, Smith's version of the events largely paralleled Carvin's. Smith presented no other witnesses in his defense, and Singleton neither testified nor presented witnesses.

The State called Detective Jamie Lawson as a rebuttal witness; Lawson had interviewed Carvin at KU Med and she testified that he was lucid and understood her questions. Lawson detailed Carvin's statement to her at KU Med, which included that he did not know the individual who drove him to Lawrence. Carvin eventually told Lawson that he heard Hooks or Thomas say, "'run that,'" so he believed he and his friends were being robbed. Carvin at first said no one from his group was armed, but later he said he might have picked up a gun that was next to him in the room.

11

After deliberating, the jury found Carvin and Singleton guilty of the lesser offense of voluntary manslaughter of Hooks, aggravated battery of Frye, and aggravated assault of Marlowe but not guilty of attempted aggravated robbery and aggravated assault of Squirrel. The jury was unable to agree on a verdict for three of the counts against Smith and found him not guilty of aggravated robbery and aggravated assault of Squirrel.

On October 10, 2018, the district court sentenced Carvin to 233 months' imprisonment for the voluntary manslaughter, 41 months' imprisonment for the aggravated battery, and 12 months' imprisonment for the aggravated assault. The district court ordered the sentences to run consecutive, for a controlling sentence of 286 months' imprisonment with 36 months' postrelease supervision. The district court also ordered Carvin to register as a violent offender and to pay restitution. Carvin timely appealed.

## SUFFICIENCY OF THE EVIDENCE

Carvin first claims there was insufficient evidence to support his conviction of voluntary manslaughter. More specifically, he argues that there was insufficient evidence to show that he possessed an unreasonable but honest belief that deadly force was justified under the circumstances in the motel room. The State disagrees.

> "In a criminal case, when a defendant challenges the sufficiency of the evidence presented by the State in support of a conviction, an appellate court examines the evidence in the light most favorable to the State to determine whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt. The appellate court does not reweigh evidence, resolve evidentiary conflicts, or make determinations regarding witness credibility. And the court must examine all the evidence favorable to the prosecution and determine whether it satisfies the essential elements of a charge. When making this review, a court does not ignore circumstantial evidence because a conviction of even the gravest offense can be based entirely on circumstantial evidence. [Citations omitted.]" *State v. Pattillo*, 311 Kan. 995, 1003, 469 P.3d 1250 (2020).

12

We begin by examining the elements of voluntary manslaughter. K.S.A. 2020 Supp. 21-5404(a) defines voluntary manslaughter as "knowingly killing a human being committed: . . . (2) upon an unreasonable but honest belief that circumstances existed that justified use of deadly force under [statutes governing the defense of a person, a dwelling, property other than a dwelling, a place of work, or an occupied vehicle], and amendments thereto." This type of voluntary manslaughter is known as imperfect self-defense. See *State v. Qualls*, 297 Kan. 61, 70, 298 P.3d 311 (2013).

The State prosecuted Carver on all the charges either as being the principal actor or under an aiding and abetting theory. As to the voluntary manslaughter charge, the district court instructed the jury that the State had to prove that Carvin, or another for whose conduct he was criminally responsible, "knowingly killed Cameron Hooks . . . upon an unreasonable but honest belief that circumstances existed that justified deadly force in defense of a person." As for Carvin's theory of self-defense, the district court instructed the jury that a "[r]easonable belief requires both a belief by defendant and the existence of facts that would persuade a reasonable person to that belief."

As stated above, Carvin contends there was no evidence that showed he had an unreasonable but honest belief that deadly force was justified. Carvin asserts that the State's evidence supported a theory that he or one of his codefendants shot Hooks either for no reason or as part of a robbery, which would not show that he shot Hooks out of an honest but unreasonable belief that deadly force was justified. Carvin asserts that if the jury believed his testimony that he shot in self-defense after he had been shot, it could not have concluded that his belief that deadly force was justified was unreasonable. On the other hand, if the jury did not believe his testimony, it could not have concluded that he had an honest belief that deadly force was justified.

Carvin's characterization of the jury's choice as an either/or decision is inaccurate. There were many conflicting versions of what happened presented to the jury. The jury

13

could piece together the various versions and come to one conclusion on a set of facts that supported a finding that Carver had an unreasonable but honest belief that deadly force was justified. For instance, Carvin testified that he did not hear any gunshots before the shooting. He testified that he "felt like a sharp pain" in his right arm, then picked up a gun and started shooting. The jury could have concluded from these circumstances that Carver's subjective belief that deadly force was justified was in fact unreasonable.

Granted, the jury could have found from the evidence that Carvin was only defending himself, thus making his belief objectively reasonable. But when this court considers a sufficiency challenge, it does not reweigh the evidence and determine what a juror should have concluded. *Pattillo*, 311 Kan. at 1003. We conclude the evidence presented at trial was sufficient to support a rational juror's finding that Carver had an unreasonable but honest belief that deadly force was justified.

As a separate issue in his brief, Carvin argues that he could not have been convicted of voluntary manslaughter under an aiding and abetting theory of liability because no evidence showed that any of the other alleged perpetrators held an unreasonable but honest belief that the use of deadly force was justified. Carvin asserts that "the State must prove every element of the underlying offense was committed by someone other than the defendant for a conviction as an aider and abettor to stand."

Carvin cites no authority that directly supports his claim. In any event, Carvin's argument presumes that he was convicted of voluntary manslaughter only as an aider and abettor. But the district court instructed the jury that to establish the charge of voluntary manslaughter, the State needed to prove that Carvin *or* another for whose conduct he is criminally responsible knowingly killed Hooks with an unreasonable but honest belief that deadly force was justified. If there was sufficient evidence to convict Carver of voluntary manslaughter as a principal, as we have just found, it does not matter whether there was sufficient evidence to convict him as an aider and abettor. Viewing the

14

evidence in the light most favorable to the State, we conclude there was sufficient evidence to support Carvin's conviction of voluntary manslaughter based on an unreasonable but honest belief that the use of deadly force was justified.

JURY INSTRUCTION ISSUES

Carvin next claims the district court erred in instructing the jury on an aiding and abetting theory of liability. Carvin argues that because no evidence supported the State's theory that he aided in a voluntary manslaughter based on imperfect self-defense, the district court clearly erred by instructing the jury to convict under such a theory. Carvin also argues that because the federal Constitution requires the State to prove each element of the crime, the district court erred by instructing the jury that it could convict him of voluntary manslaughter upon finding that he merely aided in a killing. The State argues that the district court properly included an aiding and abetting instruction, as both our existing Kansas caselaw and the facts of the case supported the instruction.

> "'When reviewing a jury instruction issue, an appellate court follows a well-known four-step analysis, whose progression and corresponding standards of review are: (1) the court considers the issue's reviewability from both jurisdiction and preservation standpoints, employing an unlimited standard of review; (2) the court determines whether the instruction was legally appropriate, using an unlimited review; (3) it determines whether sufficient evidence existed, when viewed in the light most favorable to the requesting party, to support the instruction; and (4) if the court funds error, it must then decide whether the error was harmless, using the test and degree of certainty set forth in *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011).
>
> "'The first step affects the last one because an unpreserved issue will be considered for clear error, i.e., the error may be considered harmless unless the party claiming it can convince the court the jury would have reached a different verdict without the error.' [Citations omitted.]" *State v. Gonzalez*, 311 Kan. 281, 290-91, 460 P.3d 348 (2020).

15

The aiding and abetting instruction was instruction No. 6 and the imperfect self-defense voluntary manslaughter instruction was instruction No. 17. Carvin acknowledges he did not object at trial to either instruction given by the district court. Thus, we will review the instructions for clear error and will reverse Carvin's conviction because of an error only if he can convince us that the jury would have reached a different verdict without the error. K.S.A. 2020 Supp. 22-3414(3); *Gonzalez*, 311 Kan. at 291.

Carvin's main argument that the district court erred in instructing the jury stems from his claim that there was insufficient evidence to convict him of voluntary manslaughter as an aider and abettor. He argues that because there was insufficient evidence to convict him of voluntary manslaughter as an aider and abettor, the district court's decision to give an aiding and abetting instruction created an uncertainty about which theory the jury relied on to convict him. Thus, Carvin argues that this court "should apply a super-sufficiency-like requirement before upholding a conviction in which part of the conviction is supported by insufficient evidence."

But as the State points out, our Supreme Court held in *State v. Betancourt*, 299 Kan. 131, 137-41, 322 P.3d 353 (2014), that giving an aiding and abetting instruction does not create alternative means of committing a crime or implicate the super-sufficiency analysis used in alternative means cases. As *Bettancourt* explained, "the language of the aiding and abetting statute [is] an assignment of criminal responsibility, rather than the creation of a distinct element of a crime." 299 Kan. at 139.

Based on the evidence presented at Carvin's trial, a jury instruction on aiding and abetting was legally and factually appropriate. "A person is criminally responsible for a crime committed by another if such person . . . intentionally aids the other in committing the conduct constituting the crime." K.S.A. 2020 Supp. 21-5210(a). Here, the evidence shows that Carvin acted in concert with at least Smith and Singleton in the killing of Hooks. The jury could have found based on circumstantial evidence that Carvin was the

16

actual shooter, or it could have found that Carvin assisted others in the shooting. Based on the evidence, the district court did not err in instructing the jury to consider whether Carvin was guilty of voluntary manslaughter as an aider or abettor.

Finally, we reject Carvin's claim that the aiding and abetting instruction given by the district court violated his constitutional rights because it "relieved the State of its burden of proof." Carvin's reliance on *Sandstrom v. Montana*, 442 U.S. 510, 99 S. Ct. 2450, 61 L. Ed. 2d 39 (1979), is misplaced. The instruction in that case informed the jury that a defendant is presumed to intend the consequences of his or her actions. The Supreme Court determined that this language undermined the presumption of innocence and might be read by the jury as removing the State's burden to prove the intent element of the crime charged. 442 U.S. at 521-24. There is no presumption at issue in Carvin's case. In fact, the challenged instruction explains that criminal liability only attaches to an accomplice when he or she has the culpable mental state required for the crime and the intent to aid another in its commission.

In any event, in the context of a jury instruction challenge, which is how Carvin chooses to frame this issue, he must show that the erroneous instruction affected the verdict. He has not done so, especially when, as explained above, there was sufficient circumstantial evidence to convict Carvin of imperfect self-defense voluntary manslaughter even absent an aiding and abetting theory of liability. We reject Carvin's claim that the district court's aiding and abetting instruction was clearly erroneous.

READING SQUIRREL'S PRELIMINARY HEARING TESTIMONY INTO THE RECORD AT TRIAL

Carvin next contends that the district court violated his confrontation rights under the Kansas Constitution by allowing Squirrel's preliminary hearing testimony to be read into the record at trial. He argues that section 10 of the Kansas Constitution Bill of Rights provides more extensive protection than its federal counterpart, the Sixth Amendment to

the United States Constitution, and he asks this court to depart from the long tradition of interpreting them coextensively. The State argues that this court should decline to consider the issue because it is raised for the first time on appeal and, in the alternative, the State contends that Carvin's argument is unavailing on its merits.

Squirrel's preliminary hearing testimony was read to the jury at Carvin's trial under K.S.A. 2020 Supp. 60-460(c)(2), allowing introduction of an unavailable witness' preliminary hearing transcript at trial. Carvin does not challenge the district court's finding that Squirrel was unavailable to testify at the trial. Still, he argues that under section 10 of the Kansas Constitution Bill of Rights, K.S.A. 2020 Supp. 60-460(c)(2) was applied "in an unconstitutional manner here."

Carvin acknowledges that he did not challenge the constitutionality of the statute in district court. But he argues the issue is preserved for appeal because (1) the newly asserted theory involves only a question of law arising on proved or admitted facts and is finally determinative of the case, and (2) consideration of the issue is necessary to serve the ends of justice or to prevent denial of fundamental rights. See *State v. Phillips*, 299 Kan. 479, 493, 325 P.3d 1095 (2014). We will address the issue under the second ground.

A statute's constitutionality is a question of law subject to unlimited review. *State v. Alvarez*, 309 Kan. 203, 205, 432 P.3d 1015 (2019). "Issues related to confrontation under the Sixth Amendment to the United States Constitution or the Kansas Constitution Bill of Rights, § 10 raise questions of law over which this court exercises de novo review." *State v. Brown*, 285 Kan. 261, 282, 173 P.3d 612 (2007), *abrogated on other grounds by State v. Williams*, 306 Kan. 175, 392 P.3d 1267 (2017).

Section 10 of the Kansas Constitution Bill of Rights guarantees that "[i]n all prosecutions, the accused shall be allowed . . . to meet the witness face to face." Kan. Const. Bill of Rights, § 10. Carvin contends this language creates broader protections

than the Sixth Amendment's Confrontation Clause, which provides that "'[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.'" U.S. Const. amend. VI.

But as Carvin acknowledges, the Kansas Supreme Court has repeatedly rejected the argument that section 10 prohibits the introduction at trial of an unavailable witness' preliminary hearing testimony. See, e.g., *State v. Stano*, 284 Kan. 126, 142, 159 P.3d 931 (2007) ("[T]he opportunity to cross-examine [the witness] at the preliminary hearing" by being "present at the hearing to confront [the witness] . . . satisfied defendant's confrontation rights under the Sixth Amendment and the Kansas Constitution Bill of Rights, § 10."); *State v. Ruebke*, 240 Kan. 493, 517, 731 P.2d 842 (1987) ("In cases of necessity, it is generally held that the right of confrontation under the Sixth Amendment and Section 10 of the Kansas [Constitution] Bill of Rights is satisfied if the accused has been once confronted by the witness against him at any stage of the proceedings on the same accusation and has had an opportunity of cross-examination.").

Carvin asks this court to conclude that the days of coextensive interpretation of the federal and state confrontation rights are over. But neither case Carvin cites to support this request involve the interpretation of constitutional confrontation rights. See *Hilburn v. Enerpipe Ltd.*, 309 Kan. 1127, 1144, 442 P.3d 509 (2019) (analyzing federal and state constitutional rights to a jury trial); *Hodes & Nauser, MDs v. Schmidt*, 309 Kan. 610, 638, 440 P.3d 461 (2019) (analyzing federal and state constitutional rights for a woman to terminate a pregnancy). Our Supreme Court's conclusion that some state constitutional provisions provide broader protections than the comparable federal counterpart does not suggest that the Kansas Supreme Court is departing from all prior interpretation of Kansas constitutional provisions.

This court is "duty bound to follow Kansas Supreme Court precedent unless there is some indication that the Kansas Supreme Court is departing from its previous

19

position." *State v. Dunham*, 58 Kan. App. 2d 519, 527, 472 P.3d 604 (2020). Carvin has provided no legal authority to show that the Kansas Supreme Court is considering changing its interpretation of section 10 of the Kansas Constitution Bill of Rights on confrontation rights. Thus, we reject Carvin's contention that the district court violated his confrontation rights under the Kansas Constitution by allowing Squirrel's preliminary hearing testimony to be read into the record at trial.

MOTION FOR MISTRIAL

Carvin next claims the district court erred by denying his motion for mistrial. We need to provide additional facts to address this issue. During Carvin's presentation of evidence to the jury, after a short recess and during a meeting in chambers with all parties present, the prosecutor informed the district court that a man who gave the name "John" had called the LPD the night before and stated he had information about the case. An officer who spoke with "John" believed that he was suggesting Marlowe might have been aware ahead of time that a robbery would occur at the motel and that Squirrel had arranged the robbery. Nicholson, the lead detective on the case, received the information on the call and traced "John's" phone number to Matthew Spencer, Marlowe's stepfather. Nicholson testified in-chambers about her conversation with Spencer.

Spencer told Nicholson that during an October or November 2017 conversation, Marlowe cried and told Spencer that he was afraid of Squirrel because "'Squirrel can arrange these things.'" Although Spencer asked Marlowe to explain that statement, Marlowe would not do so. Later in the conversation, Spencer said, "'We thought it was just you were in the wrong place, wrong time.'" Marlowe replied, "'Wasn't supposed to go down like this,'" but he again refused to elaborate. When Nicholson asked Spencer if any of Marlowe's statements suggested that Marlowe or Squirrel were involved in setting up a robbery, however, Spencer said they did not.

20

Based on this information, Smith moved for a mistrial because the information was "material to the testimony that one of—a material witness in this case gave which may provide further documentation of bias or information on why he may not have been entirely truthful as he testified to this Court and the jury." Singleton joined the motion but asserted that "we may be able to cure it by bringing Mr. Marlowe"—who had testified before—"back from Shawnee County [jail] this afternoon." Carvin joined the motion for mistrial, but he argued that bringing back Marlowe would not cure the problem that the new information "just opens up a lot of things that have to be investigated."

The State opposed the motion for mistrial, arguing that the new information did not open new avenues of investigation because there had always been suspicion about Squirrel's possible involvement with the shooting. The State pointed out that because the defense had not rested its case, any defendant could subpoena Marlowe and Spencer to testify. The district court noted the "almost quadruple hearsay" nature of the information at issue, so it directed Nicholson to speak with Marlowe directly, record that conversation, and share it with all counsel.

The following morning, the district court listened to the interview with Marlowe, as well as recordings of the phone calls between Spencer and the officer with whom Spencer at first spoke. Marlowe said he did not have a good relationship with Spencer, he did not and would not confide in him, and he had never talked with Spencer about why the shooting had occurred or told Spencer that he was afraid of Squirrel. Marlowe also said that he never told anyone that he thought Squirrel had set up the robbery. Marlowe stated that if Spencer said that conversation had happened, Spencer was lying.

After the district court listened to the recordings, the parties gathered again outside the presence of the jury. The district court found Spencer's allegations speculative and noted that Spencer's speculations had been followed up on during the interview with

21

Marlowe, who denied making any of the statements Spencer attributed to him. For these reasons, the district court denied each defendant's motion for a mistrial.

On appeal, Carvin argues that the district court employed the wrong standard to decide whether to grant a mistrial because it did not refer to a fundamental failure and, had the district court used the correct standard, it should have concluded that there was a fundamental failure in the trial proceedings. Carvin also contends that the State cannot meet its burden to show that the error did not affect the outcome of the trial, a burden Carvin alleges the State bears because the district court's erroneous ruling violated his constitutional rights. Thus, Carvin alleges that the district court's erroneous denial of his motion for mistrial requires this court to reverse Carvin's convictions or, at the very least, remand for consideration of the motion under the proper legal standard.

The State responds by first disputing that the district court used the wrong standard to consider whether to grant a mistrial. Even if it did, the State then argues that the district court reached the right result because there was no fundamental failure in the proceedings and because there was no reason to believe that further investigation would lead to admissible evidence. Finally, the State contends that the denial of the mistrial did not impact the outcome of the trial.

> "We review a district court's decision to deny a motion for mistrial for abuse of discretion. Judicial discretion is abused if the court's action is arbitrary, fanciful, or unreasonable; based on an error of law; or based on an error of fact. . . . [T]he party alleging error[] bears the burden of proving his substantial rights to a fair trial were prejudiced." *State v. Dean*, 310 Kan. 848, 851-52, 450 P.3d 819 (2019).

K.S.A. 22-3423(1) sets forth six grounds in which a district court may order a mistrial. Carvin's motion for mistrial stemmed from the ground that "[p]rejudicial conduct, in or outside the courtroom, makes it impossible to proceed with the trial

without injustice to either the defendant or the prosecution." K.S.A. 22-3423(1)(c). When a party seeks a mistrial on this ground, a district court must engage in a two-step analysis:

> "'First, the trial court must decide if "'there is some fundamental failure of the proceeding.'" If so, in the second step of the analysis, the trial court must assess whether it is possible to continue the trial without an "injustice." This means . . . that if there is prejudicial conduct, the trial court must determine if the damaging effect can be removed or mitigated by an admonition or instruction to the jury. If not, the trial court must determine whether the degree of prejudice results in an injustice and, if so, declare a mistrial.' [Citations omitted.]" *Dean*, 310 Kan. at 851.

Carvin contends that the district court did not use the proper analysis, pointing to the fact that the district court did not use the phrase "fundamental failure of the proceeding" and instead spoke about whether Spencer's statements were significant evidence. But as the State points out, Kansas appellate courts have held that a district court can make a fundamental failure finding without using that explicit phrase. See *State v. Kleypas*, 305 Kan. 224, 275, 382 P.3d 373 (2016). Here, it is clear from the record that the district court did not believe there was a fundamental failure in the proceedings.

Carvin also appears to misunderstand the procedural avenue to a mistrial. For a district court to grant a mistrial under K.S.A. 22-3423(1)(c), as Carvin asserts the district court should have done, there must be "[p]rejudicial conduct." See K.S.A. 2020 Supp. 22-3423(1)(c). But along with failing to identify a fundamental failure in the proceedings, Carvin alleges no specific "[p]rejudicial conduct" that would even trigger the mistrial analysis under K.S.A. 22-3423(1)(c).

In *State v. Moore*, 302 Kan. 685, 357 P.3d 275 (2015), the Kansas Supreme Court explained that a district court's first step for evaluating whether to grant a mistrial under K.S.A. 22-3423(1)(c) is "deciding whether *the prejudicial conduct* created a fundamental failure in the proceeding," a determination that "'varies with the nature of the alleged

23

misconduct, such as whether the allegation is based on the actions of a witness, the actions of a bystander, prosecutorial conduct, or evidentiary error.'" (Emphasis added.) 302 Kan. at 693. The prejudicial conduct at issue in *Moore* was that the State allegedly violated *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct 1194, 10 L. Ed. 2d 215 (1963), by failing to timely disclose exculpatory evidence. See *Moore*, 302 Kan. at 699. Violating the United States Supreme Court's directive in *Brady* would be prejudicial conduct that could trigger a mistrial under K.S.A. 22-3423(1)(c). But to obtain a mistrial, the defendant had to show that a *Brady* violation—the alleged prejudicial conduct—had occurred. *Moore*, 302 Kan. at 700-01. Because he did not, the district court did not err in denying the motion for mistrial. 302 Kan. at 701-02.

Carvin does not identify any "prejudicial conduct" other than the district court's denial of his motion. But the denial of a motion for mistrial logically cannot constitute the prejudicial conduct required to succeed on that same motion for mistrial any more than it can constitute the fundamental failure in the proceedings. And, as the State points out, Spencer's statements were timely disclosed to the defense, which distinguishes it from situations in which the State engaged in prejudicial conduct by failing to do so. Simply put, Carvin does not allege nor does the record reflect that anyone—counsel, the judge, Spencer, Marlowe, or law enforcement—engaged in prejudicial conduct that could have caused a fundamental failure in the proceeding.

In his reply brief, Carvin asserts that "[t]he whole reason why [he] needed a mistrial was because he needed his attorneys to investigate Spencer and Marlowe" because the State was "clearly biased against Carvin while investigating Spencer's new claims, evidenced by the basic fact that the State was presently trying Carvin for murder." Carvin argues the district court should have granted a mistrial so that he could perform an unbiased investigation into Spencer's statements that the State could not complete.

Carvin asked only for a mistrial that would have terminated the trial proceedings. But if Carvin wanted more time to investigate Spencer's allegations, there were other options available. He could have requested a recess to do independent investigation, or he could have joined Singleton's request that Marlowe be brought in and questioned in court. He could have subpoenaed Marlowe or Spencer and asked them about the statements. Carvin had not completed the presentation of his evidence, and the district court never ruled that Carvin could not call Spencer or Marlowe as witnesses. Considering all circumstances presented at Carvin's trial, we conclude the district court did not abuse its discretion in denying Carvin's motion for a mistrial.

PROSECUTORIAL ERROR DURING CLOSING ARGUMENT

Carvin next claims the prosecutor committed reversible error during closing argument. More specifically, he argues that during closing argument, the prosecutor improperly vouched for witnesses' credibility, inaccurately told the jury there was never a reason to kill, inappropriately commented on facts not in evidence, argued a fact with no evidentiary support, and tried to inflame the jury. The State responds that none of the challenged comments were improper. Kansas courts apply a two-step analytical framework to claims of prosecutorial error:

> "'[T]he appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If error is found, the appellate court must next determine whether the error prejudiced the defendant's due process rights to a fair trial. In evaluating prejudice, we simply adopt the traditional harmlessness inquiry demanded by *Chapman* [*v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)]. In other words, prosecutorial error is harmless if the State can demonstrate "beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict."' [Citations omitted.]" *State v. Timley*, 311 Kan. 944, 949, 469 P.3d 54 (2020).

25

The first statement Carvin challenges occurred when the prosecutor was addressing the differences in statements and testimony from Squirrel, Frye, and Marlowe. The prosecutor argued:

"And you know, the victims, you know, saw different things, and you'll notice this when you are in deliberations. You know, one juror may remember a witness saying a particular sentence, and then another juror may say, 'Well, I don't think he said it quite like that,' and another juror may say, 'Hey, I wrote it down, I have it word-for-word.' So you're going to be using your collective memories to remember what's happened, what evidence has been produced over these last two weeks. Just like the victims were trying to do that.

"And you know, yeah, they could have the [*sic*] gotten together and all decided—made up a story to say, 'Oh, yeah, four Kansas City, Kansas, guys were there. We saw all four of them with a gun in their hand. They all said "run everything."' They could have had it memorized. They could have been telling a story. *But they didn't.*

"And this is what's telling. All of them were questioned right after this happened, and that's what you have. You have their statements from right when it was—happened. They didn't have any time to get together." (Emphasis added.)

Carvin argues that the italicized language above amounts to the prosecutor saying that its witnesses told the truth. As he points out, our Supreme Court has repeatedly held that a prosecutor may not tell a jury that a witness told the truth. See, e.g., *State v. Hirsh*, 310 Kan. 321, 342-43, 446 P.3d 472 (2019) (holding it was error for the prosecutor to say of a witness, "'She told the truth'"); *State v. Dull*, 298 Kan. 832, 837, 317 P.3d 104 (2014) (holding it was error to say that the victim's version of events was "'the truth'"). Carvin contends that the prosecutor's statement that the witnesses were not "telling a story" is "synonymous with saying [those] witnesses told the truth."

But as the State responds, Carvin's argument ignores the context of the prosecutor's statement. When considered in context, the prosecutor was not improperly informing the jury that she believed the witnesses were telling the truth. Rather, she was

acknowledging the differences between their statements and pointing out the reasonable inference that had the witnesses predetermined a false version of events to relate, their statements would have matched more closely. The italicized language could reasonably be understood to point out that Marlowe, Squirrel, and Frye did not have their stories memorized and aligned. In addition, she also noted that the jury had evidence about statements the witnesses made soon after the shooting, which also supports a reasonable inference that they had not conspired to create those statements.

The wide latitude afforded prosecutors during closing argument "includes 'explaining to juries what they should look for in assessing witness credibility." *State v. Sprague*, 303 Kan. 418, 428-29, 362 P.3d 828 (2015). When taken in context, this comment was not outside the wide latitude afforded prosecutors during closing argument.

Second, Carvin points to the State's rebuttal portion of closing argument:

> "[T]here is no element in those crimes that say that the State has to prove motive. That is an extra element that the defendant wants the State to prove.
>     "And really, is there ever a reason to kill? I mean, maybe you hear about, 'Well, it was a domestic violence situation,' or, you know, 'The guy was cray cray [*sic*] and he went after people,' and maybe that's the reason for it. *But, you know, there's never a reason to kill.* But it happens." (Emphasis added.)

Carvin argues that the phrase "there's never a reason to kill" misstates the controlling law because under the law, there is at least one acceptable reason to kill—in self-defense—which was Calvin's defense in this case. Although the phrase "a reason to kill" is ambiguous, Kansas law does allow for consideration of the reason for killing. For example, as Carvin argues, voluntary manslaughter includes knowingly killing a human being upon an unreasonable but honest belief that the circumstances justify the use of deadly force. See K.S.A. 2020 Supp. 21-5404(a)(2). And under certain circumstances,

27

Kansas law provides for immunity from criminal prosecution for killing another person. See K.S.A. 2020 Supp. 21-5231.

The State responds that, when taken in context, the prosecutor was merely responding to Carvin's argument in his own closing that he had no motive to kill Hooks, Marlowe, Frye, Squirrel, or Thomas. This characterization of the context of the comment is accurate. But improper argument constitutes prosecutorial error "'even if the improper argument is made in response to arguments or statements by defense counsel.'" *State v. Marshall*, 294 Kan. 850, 860, 281 P.3d 1112 (2012). And "[a] prosecutor 'cross[es] the line by misstating the law.'" *State v. Davis*, 306 Kan. 400, 413, 394 P.3d 817 (2017). In *Davis*, our Supreme Court found prosecutorial error when the prosecutor argued to the jury that "'you don't spend the rest of your life in prison unless you killed'" because "Kansas law punishes crimes other than murder with life sentences." 306 Kan. at 413. Similarly, the prosecutor here misstated the law and, thus, committed error when she told the jury that "there's never a reason to kill."

Prosecutorial error is harmless under *Chapman* if the State can show "'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, i.e., where there is no reasonable possibility that the error contributed to the verdict.'" *Timley*, 311 Kan. at 949. The State has met that burden here. First, the misstatement of the law was directly contradicted and cured by the district court's instructions to the jury, which included an explanation that under specific circumstances, an individual may use even deadly force against another person. And as the State points out, the jury convicted Carvin of voluntary manslaughter, which shows that it found Carvin honestly but unreasonably believed he needed to use deadly force. The jury's verdict of voluntary manslaughter instead of first-degree murder shows it understood there can be a reason to kill.

28

Carvin's third challenge stems from the final portion of the State's closing arguments:

"[THE PROSECUTOR:] You are always going to have questions during the trial because we can't possibly keep you here for 365 days and give you every piece of every information about a case.

"It's our job to—

"[CARVIN'S COUNSEL]: Your Honor, I'm going to object. That's calling for them to speculate that the State has evidence that they didn't present.

"THE COURT: Sustained.

"[THE PROSECUTOR]: It's our job as prosecutors to decide what evidence to give to you to prove to you beyond a reasonable doubt. You are always going to have questions. But after the case is over—and you'll have questions, too, because the Court has made legal rulings of what you can hear.

"So after everything is done, after there is a verdict, then the Court or the attorneys can tell you.

"[CARVIN'S COUNSEL]: Your Honor, objection.

"[THE PROSECUTOR]: Answer questions.

"THE COURT: Sustained."

Carvin contends that this portion of the State's closing discussed facts that were not in evidence and "diverted the jury's attention from the evidence by implying that it had extra evidence of guilt it chose to keep from [the jury] and by talking about after-verdict discussions." The State responds that the prosecutor's statement responded to defense counsel's argument that there were too many unanswered questions to convict and that it was meant to explain to the jury that the State had to choose which evidence to present and that it cannot always answer every question a juror might have.

The parties do not provide—and our independent research has not revealed—a case involving alleged prosecutorial error of this nature. Regardless of the lack of on-point caselaw, Carvin's argument that the prosecutor's implication that there was more

evidence the jury had not seen due to time constraints and the statement that jurors could learn about more evidence after the verdict is persuasive. While the prosecutor's intent may have been understandable, the statements served no purpose other than to refer to evidence that was not before the jury. But we find the error was harmless based in part on the fact that the district court sustained Carvin's objection to the prosecutor's statement. More importantly, the district court instructed the jury that its verdict should depend only on evidence admitted in the trial. We conclude there is no reasonable possibility that the error contributed to the verdict. See *Timley*, 311 Kan. at 949.

Fourth, Carvin argues that the prosecutor erred by saying:

"They argued that, you know, these guys were running out of the room stumbling over each other because they were so panicked because they were trying not to get shot. *There is no evidence that they were getting shot.* There's no bullets going towards the door, going towards the bathroom." (Emphasis added.)

Carvin contends that the italicized language was unsupported by evidence and misstated the facts. But taken in context and considering the other evidence at trial, the prosecutor did not err by stating that no evidence showed that the men from Kansas City were being shot at as they ran out of the room. Although Carvin is correct that he suffered a gunshot wound, his own testimony was that he was shot *before* he began to run out of the room. He also testified that when he was running out the door, he believed he was the only person shooting. Moreover, as the State points out, Detective Thomas testified that the bullets fired in the motel room were traveling toward the back wall of the room, which supports a reasonable inference that no bullets were fired toward individuals running out of a door opposite that wall. Thus, the prosecutor's statement that there was no evidence the men were being shot at as they ran out of the room was sufficiently supported by admitted evidence, and it was not error.

30

Fifth, toward the very end of closing argument, the prosecutor said, "Carvin's the only one that says Hooks had the gun. And the only time he said it was here in his murder trial. *Can we bring Hooks in to say, 'Hey, no, no, no'? No. Because they shot him in the back and he's dead*." (Emphasis added.) Carvin argues that the italicized comment was intended to improperly inflame the passions of the jury by playing on sympathy over Hooks' death. The State responds that the remark responded to Carvin's allegation that Hooks had a gun on the night of the shooting and to Smith's and Singleton's arguments that Hooks was, at least in part, an instigator in the shooting.

The State's position is more persuasive. In *State v. Bennington*, 293 Kan. 503, 532, 264 P.3d 440 (2011), our Supreme Court considered whether a prosecutor had improperly tried to inflame a jury's passion by saying during closing argument, "'The victim's not here to show, to tell you her side of the story, and so we have to rely on hearsay.'" Noting that "'[p]rosecutors are not allowed to make statements that inflame the passions or prejudices of the jury,'" the *Bennington* court found that the remarks "were not an attempt to create sympathy but were an attempt to support the State's case, despite its inability to present testimony from the victim." 293 Kan. at 532-33.

The same is true of the prosecutor's statement in this case. Carvin had testified that Hooks pointed a gun at him. Smith argued during closing that "[i]t is equally plausible that Mr. Carvin was lured to this hotel to be robbed by Mr. Squirrel and Mr. Hooks and Mr. Thomas." Singleton similarly argued during closing that there was "evidence of an attempted robbery by Squirrel and Hooks and Thomas and that group against the four men from Kansas City." During the rebuttal portion of closing, when the prosecutor said that Hooks could not testify because he was dead, she did not use inflammatory language or otherwise appear to be trying to stoke the jury's passion. Rather, she was pointing out that because he had died as a result of the shooting, Hooks could not testify to rebut the testimony that he had a gun or the arguments that he had instigated the shooting. Like the

31

statements made in *Bennington*, this remark is within the latitude allowed prosecutors to craft closing argument and it does not constitute prosecutorial error. See 293 Kan. at 533.

CUMULATIVE ERROR

Finally, Carvin argues that even if no error individually warrants reversal of his convictions, the cumulative effect of the errors does so. The State disagrees.

> "The test for cumulative error is whether the errors substantially prejudiced the defendant and denied the defendant a fair trial given the totality of the circumstances. In making the assessment, an appellate court examines the errors in context, considers how the district court judge addressed the errors, reviews the nature and number of errors and whether they are connected, and weighs the strength of the evidence. If any of the errors being aggregated are constitutional, the constitutional harmless[ness] test of *Chapman* applies, and the party benefitting from the errors must establish beyond a reasonable doubt that the cumulative effect of the errors did not affect the outcome. [Citations omitted.]" *State v. Thomas*, 311 Kan. 905, 914, 468 P.3d 323 (2020).

We have agreed with only two of Carvin's claims of error: In closing argument, the prosecutor misstated the law by informing the jury there is no reason to kill, and she erred by referring to evidence the State allegedly possessed that had not been admitted at trial. Considered in context, the comments were made close in time and toward the end of the two-week trial. The comments did not pervade the trial, the district court sustained an objection to the second comment, and the jury instructions steered the jury back to the appropriate considerations and correctly stated the law. Considering the totality of the circumstances, the two instances of prosecutorial error during closing argument, even when considered in the aggregate, did not deny Carvin a fair trial.

Affirmed.

32